## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. STRATFORD HOLDING, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-12-0772-HE |
| | ) | [Consolidated Number] |
| 1. FOOT LOCKER RETAIL INC., | ) | |
| 2. FOG CAP RETAIL INVESTORS, LLC, | ) | |
| 3. KYSER KONCEPTS, LTD, | ) | |
| 4. ARTHUR B. KYSER, | ) | |
| 5. TIMOTHY W. KYSER, | ) | |
| 6. DEBORAH MANNECK, | ) | |
| 7. JEFFREY P. GREEN, | ) | |
| 8. WILLIAM E. CHUNGA, and | ) | |
| 9. FOG CUTTER CAPITAL GROUP INC. | ) | |
| 10. SUMMIT INVESTMENT MANAGEMENT LLC | ) | |
| 11. SBN FCCG LLC | ) | |
| 12.  SUMMITBRIDGE  NATIONAL | ) | |
|      INVESTMENTS, LLC | ) | |
| | ) | |
| Defendants. | ) | |

## FOURTH AMENDED COMPLAINT

For its Fourth Amended Complaint against Foot Locker Retail, Inc. ("Foot Locker"), Fog Cap Retail Investors LLC ("Fog Cap"), Kyser Koncepts, LTD, Arthur B. Kyser, Timothy W. Kyser, and Deborah Manneck d/b/a $1.25 Cleaners (collectively the "Kyser Defendants"), William E. Chunga d/b/a $1.25 Cleaners #1 ("Chunga"), Jeffrey P. Green d/b/a $1.75 Cleaners ("Green"), Fog Cutter Capital Group, Inc. ("Fog Cutter"), Summit Investment Management LLC ("Summit"), SBN FCCG LLC ("SBN"), and

SummitBridge National Investments, LLC (**"SummitBridge"**) Plaintiff, Stratford Holding, LLC ("Stratford"), alleges and states as follows:[1]

## PARTIES

1.      Stratford is a New York limited liability company with its principal place of business at 119 West 57th Street, #906, New York, New York, 10019.

2.      Stratford's sole member is Abnet Realty, a New York general partnership.

3.      Foot Locker is a New York corporation with its principal place of business at 112 W 34th Street, New York, New York, 10120.

4.      Fog Cap is an Oregon limited liability company with its principal place of business at 1410 SW Jefferson Street, Portland, Oregon, 97201.  Fog Cap's sole member is SBN FCCG LLC, a Delaware limited liability company with its principal place of business in Colorado.

5.      Kyser Koncepts, LTD, Arthur B. Kyser, Timothy W. Kyser, and Deborah Manneck are residents of the State of Texas.

6.      Green is a resident of Oklahoma, has declared bankruptcy, and is named solely with respect to Stratford's claims seeking RCRA injunctive relief.

7.      Chunga is a resident of Oklahoma.

8.      Fog Cutter is a California corporation with its principal place of business in California.

---

[1] This Fourth Amended Complaint is solely for purposes of adding SummitBridge and asserting Stratford's claims against SummitBridge.  By filing this Fourth Amended Complaint, Stratford is in no way altering or amending the claims asserted by Stratford against the prior parties.

8.1     Summit is a Colorado limited liability company with its principal place of business at 1700 Lincoln Street, Suite 2150, Denver, CO 80230

8.2     SBN is a Delaware limited liability company with its principal place of business at 1700 Lincoln Street, Suite 2150, Denver, CO 80230.

8.3     SummitBridge is a limited liability company registered in Delaware with a principal place of business at 1251 Avenue of the Americas, 16th Floor, New York, New York, 10020.

## JURISDICTION AND VENUE

9.      Several of Stratford's claims are brought pursuant to the citizen suit provision of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901, et seq., regarding which notice was properly served on Defendants Foot Locker, Fog Cap, the Kyser Defendants, Green and Chunga (collectively, the "RCRA Defendants") pursuant to 40 C.F.R. Part 254.

10.     This Court has subject matter jurisdiction over Stratford's RCRA claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 6972(a).

11.     This Court has subject matter jurisdiction over Stratford's claims under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42. U.S.C. §§ 9601, et seq., pursuant to 28 U.S.C. § 1331.

12.     Pursuant to 28 U.S.C. § 1367, this Court has jurisdiction over Stratford's pendent state law claims.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), 42 U.S.C. §6972(a), and 42 U.S.C. § 9613(b).

## BACKGROUND
### *The Lease*

14.     In or around February 1977, 63 Associates, Inc., as Lessor, and Kinney Shoe Corporation, as Lessee, entered into a Lease Agreement (the "Lease") relating to certain real property located at 7307 N. McArthur Boulevard in Oklahoma City, Oklahoma (the "Property").  A true and correct copy of the Lease is attached hereto as Exhibit "1".

15.     Foot Locker is the corporate successor-in-interest to Kinney Shoe Corporation, the original Lessee under the Lease.

16.     Stratford is the corporate successor-in-interest to 63 Associates, Inc., the original Lessor under the Lease.

17.     The Lease was for thirty (30) years, with Lessee's right to renew and extend for three (3) additional terms of five (5) years each, of which one was exercised, causing the Lease to expire on or around February 24, 2012.

18.     The Lease states that the "Lessor shall not incur or become liable for any costs, expenses or obligations of any kind and nature whatsoever relating to the [Property] during the term of this Lease."  Lease, Article I, Section 1.2.

19.     As a part of the Lease, the Lessee also agreed to "at its sole cost and expense, maintain the [Property] and make repairs thereto and replacements thereof . . . so that the [Property] shall continue in the same repair and operating condition as at the beginning of the term of this Lease, ordinary wear and tear and obsolescence excepted."  Lease, Article IV, Section 4.1.

20.     The Lease further states that the "Lessee shall, during the term of th[e] Lease, at its sole cost and expense, comply with all valid laws, ordinances, regulations, orders and requirements of any governmental authority, which may be applicable to the [Property] now or in the future or to the use, manner of use, or occupancy thereof, whether or not the same shall necessitate structural repairs or alterations or interfere with the use or occupancy of the [Property]." Lease, Article VIII, Section 8.1.

21.     The Lease also contained a provision whereby the Lessee agreed to:

[I]ndemnify and hold [the Lessor] harmless from and against any and all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable attorneys' fees, which may be imposed upon or incurred by [the Lessor] by reason of any of the following occurring during the term of this Lease:

(i)     Any work or thing done in, on or about the [Property] or any part thereof;
(ii)    Any use, non-use, possession, occupation, condition, operation, maintenance or management of the [Property] or any part thereof;

(iii)   Any negligence of [the Lessee] …;

(iv)    Any… damage to any … property…; and

(v)     Any failure on the part of [Foot Locker] to perform or comply with any of the agreements, terms or conditions contained in this Lease…

Lease, Article XII, Section 12.1.

22.     Other relevant provisions of the Lease:

(a)     Made the Lessee responsible for the payment of all taxes and assessments levied on the Property, the costs of all utilities, permits and required licenses, the costs of required insurance, and the costs of all required maintenance and/or repairs;

(b)     Granted the Lessee the right to make any alterations to the Property it so desired, to add any trade fixtures it deemed necessary to its business but which never became part of the Premises, and to otherwise quietly enjoy the premises free from intervention by the Lessor; and

(c)     Granted the Lessee the ability to sublet the Property without the Lessor's knowledge or consent; and

Lease, Articles II, III, IV, VI, VII, and XI.

23.     Finally, the Lease:

(a)     provides that, in subletting the Demised Premises, "the Lessee … shall remain liable for the payment of rent hereunder, and for the performance of all of the agreements, conditions, covenants and terms herein contained"; and

(b)     authorizes an assignment of the Lease but states "the assignee shall, in writing, assume and agree to keep, observe and perform all of the agreements, conditions, covenants and terms of this Lease on the part of the Lessee to be kept, observed and performed, and shall be, and become, jointly and severally liable with the Lessee for the non-performance thereof."

Lease, Article XI, Sections 11.2 and 11.3(b) respectively.

24.     The Lease, and the sub-leases created by Foot Locker (and its predecessors) and Fog Cap, conveyed such extensive rights in, duties regarding, and control over the Property, dry cleaning operation and remediation of any contamination that may have been caused by the dry cleaning operation to Foot Locker (and its predecessors) and Fog Cap that they are deemed owners and operators for purposes of CERCLA, RCRA and Oklahoma law.

### *Life under the Lease*

25.     In the years immediately following the execution of the Lease, Kinney Shoe Corporation operated a shoe store on the Property.

26.     In or around October 1995, Kinney Shoe Corporation, as Sub-Lessor, entered into a sublease of the Property (the "Kyser Sub-Lease") with the Kyser Defendants.  A true and correct copy of the Kyser Sub-Lease is attached hereto as Exhibit "2".

27.      By its own terms, the Kyser Sub-Lease was executed for the specific and sole purpose of the Kyser Defendants using the Property as a "full service dry cleaning plant and laundry."  See Kyser Sub-Lease at § 401.

28.     Upon information and belief, the Kyser Defendants, in accordance with this provision of the Kyser Sub-Lease, installed or caused to be installed the equipment, machines, etc. necessary to operate a dry cleaning plant and laundry on the Property.

29.     The Kyser Sub-Lease placed a duty upon the Kyser Defendants not to allow hazardous material—as that term is defined by the EPA—"to be brought upon, kept, used, generated, stored, manufactured, released, or discharged in or about the [Property]. . . . ." See Id. at § 1702 (1).

30.     The Kyser Sub-Lease also mandated that, if the Kyser Defendants caused contamination of the Property by hazardous materials, then the Kyser Defendants had to remediate upon Kinney Shoe Corporation's prior written approval. Id.  If the Kyser Defendants were not in compliance with this requirement, then Kinney Shoe Corporation reserved the right to immediately enter the Property and remedy any contamination caused

by the Kyser Defendants' failure to comply.  See Kyser Sub-Lease, Article XVII, § 1702 (3).

31.     With the Lease and Sub-Lease provisions dictating that Kinney Shoe Corporation, as the Sub-Lessor of the Property, retained both the ownership of the dry cleaning equipment and the right to enter and remedy any contamination, Kinney Shoe Corporation, as the Sub-Lessor of the Property, retained the right of ultimate control over the Property and RCRA Facility, and any hazardous waste stored or disposed of there during the time of the Kyser Sub-Lease, and thereafter, pursuant to the Lease post-assignment obligations.

32.     At some time between November 1995 and January 1996, William E. Chunga entered into a "Lease and Option Agreement" with the Kyser Defendants for the operation of a dry cleaning business at the Facility.  Pursuant to a "Certificate of Fictitious Name of $1.25 Cleaners #1" filed in the land records of Oklahoma County Clerk's office, a copy of which is attached hereto as Exhibit "3", on November 14, 1995, William E. Chunga was the sole owner and operator of a dry cleaning business with a return address of 7307 N. MacArthur, Oklahoma City, Oklahoma, 73132.

33.     Upon information and belief, Chunga participated in the operation of $1.25 Cleaners from January 1996 until May 1996 under the Lease and Option Agreement with the Kyser Defendants.  During that time there were at least three releases of PCE solvent from the dry cleaning equipment.

34.     Upon information and belief, during the time Chunga participated in the operation of $1.25 Cleaners #1, the Kyser Defendants likewise participated in the

operation.  According to statements made by Chunga to the Oklahoma Department of Environmental Quality, revenue from the dry cleaning operation was transferred to an accountant that was selected by the Kyser Defendants.  The accountant paid the bills and expenses of the operation, including the payment of a $500 weekly salary to Chunga.  Any additional profit was placed in an account to be held until such time that the purchase option was exercised by Chunga.  Chunga and the Kyser Defendants agreed that if the purchase option was not exercised by Chunga, the funds were to go to the Kyser Defendants.

35.    In May 1996, Chunga terminated the Lease and Option Agreement with the Kyser Defendants.  However, Chunga agreed to continue operations at $1.25 Cleaners until the Kyser Respondents were able to locate a new operator.

36.    Shortly after Chunga's termination of the Lease and Option Agreement with the Kyser Defendants, Green entered into a similar Lease and Option Agreement (attached as Exhibit "4") with the Kyser Defendants for operation of a dry cleaning business under the name "$1.25 Cleaners" at the Property.

37.    In 1998, 63 Associates assigned its interest in the Property, and thereby the Lease, to Stratford.

38.    On or about October 9, 2002, Foot Locker, who had by that time become the corporate successor-in-interest to the Kinney Shoe Corporation, executed an assignment of its interest in the Lease (the "Fog Cap Assignment") to Fog Cap, retaining liabilities and duties pursuant to post-assignment Lease provisions.  A true and correct copy of the Fog Cap Assignment is attached hereto as Exhibit  "5".

39.     The sole member and manager of Fog Cap at the time of the Fog Cap Assignment was Fog Cutter.   Fog Cutter managed the Lease under a management agreement with Fog Cap.   On information and belief, as agent or employee of Fog Cap, Fog Cutter was, thus, also contractually obligated to, and did exercise direct control and supervision over the handling and disposal of hazardous substances and hazardous wastes at and from the Property, and was also responsible for ensuring that contaminants did not seep into the Property and, if they did, to properly address them. Even after Fog Cutter later relinquished its membership interest in Fog Cap, Fog Cutter continued to manage the Lease pursuant to its agreement with Fog Cap.

40.     Following Foot Locker's execution of the Fog Cap Assignment, the Kyser Defendants continued to sublease the Property from Fog Cap under the Kyser Sub-Lease for the specific and sole purpose of using the Property as a "full service dry cleaning plant and laundry," and Green continued to sublease the Property from the Kyser Defendants.

41.     In or around November 2006, the Kyser Sub-Lease terminated by its own terms.

42.     In or around October 2006, shortly prior to the termination of the Kyser Sub-Lease, Green (as sub-lessee) executed a new sub-lease (the "Green Sub-Lease") signed by Fog Cutter (as sole member and manager) on behalf of Fog Cap (as sub-lessor).   A true and correct copy of the Green Sub-Lease is attached hereto as Exhibit "6".

43.     Pursuant to the terms of the Green Sub-Lease, Green was to use the Property "for a Dry Cleaner, and for no other purpose."   See Green Sub-Lease at § 401.

44.     The Green Sub-Lease placed a duty upon Green not to allow hazardous material—as that term is defined by the EPA—"to be brought upon, kept, used, generated, stored, manufactured, released, or discharged in or about the [Property]. . . ."  See Id. at § 1702 (1).

45.     The Green Sub-Lease also mandated that if Green caused contamination of the Property by hazardous materials, then Green had to remediate upon Fog Cap's prior written approval.  If Green was not in compliance with this requirement, then Fog Cap reserved the right to immediately enter the Property and remedy any contamination caused by Green's failure to comply.  See Green Sub-Lease, Article XVII, § 1702 (3).

45.1    On or about February 15, 2008 SBN purchased 100% of the membership units in Fog Cap from Fog Cutter (See Exhibit 10), and assumed management and control of Fog Cap on or before December 31, 2008. See Fog Cap Articles of Amendment at Exhibit 10.1.

45.2    SBN received a fee from Fog Cap in the amount of $10,000 per month for management of the Property and other properties in Fog Cap's portfolio.  See Exhibit 11 at 18:13 – 19:7.

45.3    On information and belief, SBN exercised direct control and supervision over the handling and disposal of hazardous substances and hazardous wastes at and from the Property, and was also responsible for ensuring that contaminants did not seep into the Property and, if they did, to properly address them.

46.     On or about August 2008, Fog Cap initiated and completed eviction proceedings against Green.

47.     With the Lease and Sub-Lease provisions dictating that Fog Cap, as Sub-Lessor of the Property, retained both the ownership of the dry cleaning equipment and the right to enter and remedy any contamination, Fog Cap, as the Sub-Lessor of the Property, retained the right of ultimate control over the Property and RCRA Facility, and any hazardous waste stored or disposed of there during the time of the Green Sub-Lease, as did Foot Locker pursuant to the post-assignment Lease provisions.

47.1     On information and belief, on or before June 30, 2009, Defendant Summit also assumed control of the Property.

47.2     On information and belief, on or before June 30, 2009, Defendant Summit assumed control of SBN and Fog Cap. See Exhibit 11.1 at p 7-8, and Exhibit 11.2 (Draft reservation of rights agreement from counsel for Summit and Fog Cap stating that Summit "currently controls SBN")).

47.3     On June 30, 2009, Summit (Mr. Jack Martinez) emailed its approval of an arrangement whereby a Mr. Harold Hall was "to go inside the building and take all the metal in the building.  For Free.  He will sell the metal for scrap.  As part of the deal, he would take all the environmental stuff and dispose of it as well." (See Exhibit "12").  The offer by Harold Hall was transmitted by Mr. Mark Inman of CB Richard Ellis (CBRE), a commercial real estate broker in Oklahoma City.

47.4     Approximately one month later, on August 25, 2009, five drums of hazardous waste were removed from the Property (See Field Ticket at Exhibit 13).

47.5     In November of 2009, Mr. Martinez (Summit) sent an email directing that CBRE "get an agreement in place to fix up this property." (See Exhibit 14)

47.6    Shortly thereafter, on December 29, 2009, CBRE (Jim Wilmoth) emailed Ann Danielson (Summit) with his assessment of the Property and included a copy of a CBRE Construction Management Service Agreement and pictures of "electrical vandalism 3-16-09," "Equip Pics" and "pics of hazardous waste 3-16-09." (See Exhibit 15.1-15.5) The pictures show the building in deplorable conditions with apparent chemical spillage near the dry cleaning machines.

47.7    On information and belief Summit exercised direct control and supervision over the handling and disposal of hazardous substances and hazardous wastes at and from the Property, and was also responsible for ensuring that contaminants did not seep into the Property and, if they did, to properly address them.

48.    In or around November 2011, the Green Sub-Lease terminated by its own terms.

49.    In or around February 2012, the Lease terminated by its own terms and Stratford, who by that time had succeeded 63 Associates as Lessor under the Lease, regained full and complete control of the Property.

### Post-Lease Discoveries

50.    At the time it regained possession of the Property, Stratford found the Property to be significantly damaged, full of trash and dry cleaning equipment, and not in the same state of repair and maintenance that existed at the time the Lease was executed. Stratford also became aware of the fact that a hazardous chlorinated solvent which is commonly used in the dry cleaning business and is known as tetrachloroethene a/k/a

tetrachloroethylene or perchloroethylene ("PCE"), may have seeped into the building structure on the Property, as well as the soil and groundwater underlying the Property.

51.     Prior to the execution of the Kyser Sub-Lease, no dry cleaning operations had been conducted on or near the Property.

52.     During the terms of the Kyser Sub-Lease and the Green Sub-Lease, first the Kyser Defendants and Chunga, and then the Kyser Defendants and Green, jointly operated a dry cleaning business on the Property, under the control and oversight of the landlords, Foot Locker (and its predecessors) and Fog Cap.

53.     Upon information and belief, as part of the dry cleaning operations of the Kyser Defendants, Chunga and Green, PCE was used in specially designed machines in which it was sprayed onto fabrics in rotating baskets.  As PCE passed through the fabrics, it removed and entrained dirt and grime.  PCE contaminated with dirt and grime was then reclaimed by passing it through a filter or other process which removed the contaminants from the solvent.  Reclaimed PCE was re-circulated and repeatedly re-used in the dry cleaning process.  Solvent-containing fabrics removed from the cleaning baskets were heated to vaporize any remaining solvents, and such solvents were then condensed over cooling coils.  As part of the process, any moisture accumulating in the PCE during these processes would be separated from the solvent, collected and disposed.  Waste filters and/or sludge were also necessarily generated by the processes and required to be properly disposed.

54.     Upon information and belief, while carrying out dry cleaning operations on the Property, the Kyser Defendants, Chunga and Green caused or allowed hazardous

materials, including hazardous waste and hazardous substances, generated by the dry cleaning equipment, including PCE, water contaminated with PCE, and/or sludge containing PCE, to be leaked, spilled, discharged, emitted, dumped, discarded, disposed, condensed or otherwise released onto and through the floor of the Property, into and out of the sanitary sewer, and/or into the area surrounding the Property, and to otherwise migrate into the environment at and around the Property, including into soil and groundwater.

55.     Foot Locker and Fog Cap failed to fulfill their obligations under the Lease and duties under the sub-leases, creating the possibility of releases of hazardous waste and hazardous substances, allowing and, or, causing these releases and failing to remediate the Property as provided by the Lease, and, upon information and belief, Fog Cutter failed to remediate and restore the Property as required by its management agreement.

55.1     Upon information and belief, SBN and Summit failed to fulfill Fog Cap's obligations under the Lease and to remediate and restore the Property as required by applicable management agreements.

55.2     On information and belief, during the time when SBN and Summit controlled Fog Cap and the Property, dry cleaning chemicals and wastes remaining at the Property and in the abandoned equipment were unlawfully disposed and/or released at the Property as a result of actions taken by SBN and Summit.

56.     Attached hereto as Exhibit "7" is a true and correct copy of a report from Terracon Consultants, Inc. ("Terracon"), which shows the approximate location of the remaining dry cleaning equipment and that PCE has been allowed to seep into the soil and water underlying the Property, above concentrations requiring immediate action.

57.    Terracon collected soil and groundwater data at the Property on January 23, 2012.  Terracon's data demonstrate the presence of PCE at concentrations as high as 5,830 milligrams per kilogram (mg/kg) in the soil, and 7,030 micrograms per liter (ug/L) in the groundwater underlying the Property.

58.    Terracon's data demonstrate that the Property has been damaged by PCE having seeped into the building structure on the Property, as well as the soil and groundwater underlying the Property.   These high concentrations far exceed the Environmental Protection Agency ("EPA") Region 6 Regional Screening Level Summary Table dated November 2011 for PCE contamination for soil (0.55 mg/kg for residential, 2.6 mg/kg for industrial) and the EPA maximum contaminant level for groundwater (5 ug/L), as well as the RCRA Land Disposal Restriction of 6.0 mg/kg.

59.    In connection with Terracon's discovery of PCE in the soil and groundwater underlying the property, the State of Oklahoma's Department of Environmental Quality ("ODEQ"), on or about November 14, 2012, filed an Administrative Compliance Order ("ACO") (attached hereto as Exhibit "8.1 and 8.2") issued to Stratford (which was served on November 26, 2012), the Kyser Defendants, Chunga and Green (collectively, the "ACO Respondents") pursuant to the Oklahoma Environmental Quality Code.  27A Okla. Stat. Ch. 2 (including, but not limited to, 27A Okla. Stat. § 2-7-101 *et seq* (the Oklahoma Hazardous Waste Management Act (*"OHWMA"*) (which incorporates by reference the federal hazardous waste regulations under RCRA)), and 27A Okla. Stat. § 2-6-105 (general pollution prohibition)).

60.     In the ACO, ODEQ alleges that the activities of the ACO Respondents "damaged the [Property] causing substantial contamination of the property's soil and groundwater" and orders the ACO Respondents to "abate the contamination . . . and mitigate the endangerment to the health and safety of persons and property that are negatively impacted by the contamination." The ACO further requires that the abatement be "performed in a manner consistent with the National Contingency Plan, 40 CFR parts 300-399," and include, among other things, a Health and Safety Plan, Site Characterization Plan, Site Characterization Report, and Remediation Work Plan.

61.     In response to the allegations in the ACO, Stratford entered into a consent order with ODEQ, which was signed by ODEQ on March 12, 2013. A copy of the executed consent order is attached hereto as Exhibit "9".

### State Statutory and Regulatory Framework

62.     In response to the problem of improper hazardous waste disposal, the Oklahoma Legislature enacted the OHWMA.

63.     The OHWMA is administered by ODEQ. Okla. Stat. Tit. 27A, § 2-7-104; Oklahoma Environmental Quality Code, Okla. Stat. Tit. 27A, § 2-1-101, *et seq*.

64.     Pursuant to the OHWMA, ODEQ has, with certain minor exceptions not relevant to this matter, adopted and incorporated by reference the federal RCRA regulations at 40 C.F.R. Parts 260 – 273 pertaining to hazardous waste management, treatment and disposal. OAC 252:205-3-1 *et seq*.

65.     On January 10, 1985, in granting Oklahoma final authorization to implement and enforce RCRA requirements in Oklahoma, EPA incorporated certain Oklahoma

statutes and regulations into the federal hazardous waste management program.  40 C.F.R. Part 272, Subpart LL.

### *Allegations Regarding SummitBridge*

65.1    SBN is a holding company that was formed to hold the equity of Fog Cap. SBN's interest in Fog Cap has been its sole asset, and SBN is the sole member and owner of Fog Cap.

65.2    Fog Cap's Second Amended and Restated Limited Liability Company Operating Agreement provides that Fog Cap is member managed and that the member (SBN) makes all decisions regarding the management and operation of Fog Cap.

65.3    SummitBridge is and all times relevant hereto has been the sole member and owner of SBN.

65.4    SBN's Limited Liability Company Operating Agreement provides that there is no "manager", that SummitBridge is the "agent" of SBN, and that SummitBridge's actions shall "bind" SBN.

65.4    Therefore, Fog Cap is controlled by SBN, which is in turn controlled by SummitBridge.

65.5    Neither Fog Cap nor SBN has ever had any employees.

65.6    On January 1, 2007 SummitBridge and Summit entered into a Third Amended and Restated Asset Management and Servicing Agreement ("3rd Asset Management Agreement").

65.7   Under the terms of the 3rd Asset Management Agreement, SummitBridge designated Summit as its "agent for the purpose of performing the services described in this Agreement."

65.8   Summit's services to SummitBridge are described under the 3rd Asset Management Agreement as "advisory, consultation, disposition and management services for assets purchased in accordance with this Agreement".

65.9   By virtue of SummitBridge's sole ownership and control of SBN and SBN's corresponding sole ownership of Fog Cap, the Lease that was assigned by Foot Locker to Fog Cap was an asset as defined in the 3rd Asset Management Agreement. Therefore, Summit's obligations under the agreement included providing services concerning the Lease and the Property.

65.10  The 3rd Asset Management Agreement provided that SummitBridge would "retain title, ownership and exclusive control of the assets purchased by it."

65.11  Summit was required under the 3rd Asset Management Agreement to "engage environmental consultants and other professionals acceptable to [SummitBridge] to perform environmental and physical condition evaluations" of properties falling under the 3rd Asset Management Agreement.

65.12  Summit was further required to "inspect (or cause to be inspected) the physical condition of" of properties falling under the 3rd Asset Management Agreement no less than annually (and no less than semi-annually for assets with values exceeding $500,000).

65.13 From the date that SBN acquired Fog Cap (February 15, 2008), SummitBridge controlled the Lease and the Property and all actions taken by Summit regarding the Lease and the Property were taken as agent of SummitBridge.

65.14  When Green was evicted from the Property on or about August 15, 2008, he did not remove any of the dry-cleaning equipment or chemicals from the Property.

65.15. At Green's eviction, there was between 150 to 300 gallons of PCE left in the dry-cleaning machines on the Property.  In addition, other hazardous materials and chemicals used in the dry-cleaning operations were left about the Property.

65.16. Summit, as agent for SummitBridge, was informed in 2008 that the Property was in poor condition and that toxic chemicals were left on the Property and needed to be properly disposed of.

65.17. Summit continued to provide services for SummitBridge under a Fourth Amended and Restated Asset Management and Servicing Agreement ("4th Asset Management Agreement") dated January 1, 2009.  Summit's duties regarding the Lease and the Property remained substantially the same under the 4th Asset Management Agreement as under the 3rd Asset Management Agreement.

65.18. On May 11, 2009, Summit, as agent for SummitBridge, sent a Summit employee to Oklahoma City to inspect the property.

65.19. When Summit, on June 30, 2009, approved of Harold Hall going to the Property to "take all the environmental stuff and dispose of it", Summit made such approval as agent for SummitBridge.  SummitBridge did not vet, either directly or indirectly through its agent Summit, Harold Hall's qualifications to handle and dispose of hazardous waste.

65.20. Summit, as agent for SummitBridge, continued in 2009 to receive reports from Oklahoma that the Property was in deplorable condition, that dry-cleaning equipment was still on the property and that chemicals referred to as "bio-hazard" were in the building.

65.21. Summit's knowledge concerning the Property is imputed to Summit's principal, SummitBridge, and Summit's acts or omissions concerning the Property are in law the acts or omissions of its principal, SummitBridge.

65.22. Despite receiving repeated reports of hazardous chemicals on the Property in 2008 and 2009, neither Summit nor SummitBridge took any meaningful steps to investigate, secure or dispose of hazardous chemicals on the Property.

65.23. After the lease terminated in 2012, Stratford learned that the 150 to 300 gallons of PCE left in the dry-cleaning equipment at Green's eviction was no longer in the dry-cleaning equipment.  There is no record of the PCE being properly removed from the Property or properly disposed of.

65.24. During the time period that SummitBridge had control of the Property and during the time the 150 to 300 gallons of PCE was somehow removed from the dry-cleaning equipment, the Property was vandalized and burglarized and the dry-cleaning equipment was cut with what appears to have been a cutting torch.

65.25. SummitBridge failed to cause the PCE and other hazardous materials and chemicals to be properly secured and disposed of following Green's eviction and SummitBridge failed to maintain the Property.

65.26. SummitBridge's acts and omission caused the soil and groundwater underlying the Property to be contaminated with PCE.

65.26. SummitBridge, SBN and Fog Cap are mere instrumentalities, agents, or alter egos of one another and for all practical purposes are one and the same.  Accordingly, any corporate distinctions must be disregarded, and these entities should all be treated as one under applicable law.

**COUNT I[2]**
**(<u>Against the RCRA Defendants</u>)**
**CONTINUING VIOLATION OF RCRA REQUIREMENTS**
**42 U.S.C. § 6972(a)(1)(A)**

66.    Stratford incorporates fully all previous paragraphs.

67.    RCRA's citizen suit provisions, sections 7002(a)(1)(A) and (B), entitle Stratford to seek relief against the RCRA Defendants in Federal District Court. 42 U.S.C. § 6972(a)(1)(A) & (B).  Under section 7002(a)(1)(A), "any person may commence a civil action on his own behalf" against a person who is "in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter." 42 U.S.C. § 6972(a)(1)(A)

68.    The RCRA Defendants are responsible for ongoing violations of the following standards, regulations, conditions, requirements, and prohibitions which have become effective pursuant to RCRA, as implemented by the State of Oklahoma:

a.    **Disposal of Hazardous Waste without a RCRA Permit or Interim Status, pursuant to OAC 252:205-3-2(k) (40 C.F.R. § 270.1(b), 40 C.F.R. § 272.1851**). The concentrations of PCE in the soil and groundwater underlying the Property constitute "disposal," per OAC 252:205-3-2(b)(40

---

[2] This Count has been dismissed by the Court and no answer to this Count is required.

C.F.R. § 260.10), of PCE "solid waste," OAC 252:205-3-2(c) (40 C.F.R. § 261.2), that constitutes "hazardous waste," OAC 252:205-3-2(c) (40 C.F.R. § 261.31), on the Property without a RCRA Permit or Interim Status. RCRA Defendants' disposal continues to this day as the PCE continues to be discharged into the groundwater from the contaminated soils.

b.      **Failing to meet Land Disposal Restrictions (LDR) by disposing of Hazardous Waste above applicable LDR standards, pursuant to OAC 252:205-3-2(j) (40 C.F.R. §§ 268.40, 268.48 and 40 C.F.R. § 272.1851).** The concentrations of PCE, an F001 and F002 listed hazardous waste, in the soil at the Property currently exceeds the PCE LDR standard of 6.0 mg/kg by almost 1000 times. Therefore, the RCRA Defendants are in violation of OAC 252:205-3-2(j) (40 C.F.R. §§ 268.40 and 268.48) for disposing of hazardous waste on the Property without meeting the applicable LDR standards, which disposal continues to this day as the hazardous waste continues to migrate.

c.      **Failing to Complete Hazardous Waste Determinations pursuant to OAC 252:205-3-2(d) (40 C.F.R. § 262.11 and 40 C.F.R. § 272.1851).** Pursuant to OAC 252:205-3-2(c) (40 C.F.R. § 261.2), the PCE placed on the ground is solid waste because it was disposed of on the ground. The RCRA Defendants failed to determine whether the waste was hazardous waste before disposing of the waste on the ground of the Property, which failure

continues to this day with each day of continuing disposal resulting from migration of the hazardous waste.

d.   **Failing to Take All Necessary Action to Address the PCE Release pursuant to OAC 252:205-13-1 (40 C.F.R. § 272.1851).**  As owners and site managers of the dry cleaning facility which they operated upon the Property in a manner that resulted in releases of PCE to the soils, air and ground waters, which could, if unaddressed, threaten human health or the environment, the RCRA Defendants were required to take all necessary action to address the ongoing releases.  The RCRA Defendants have taken no action, and continue to take no action.

69.   The RCRA Defendants' failures constitute one or more ongoing violations of a "standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant" to RCRA.  42 U.S.C. § 6972(a)(1)(A).

70.   The applicable notice required for bringing this action under 42 U.S.C. § 6972(c) has been given to the RCRA Defendants.

71.   Pursuant to 42 U.S.C. § 6972(a)(1)(A), Stratford is entitled to a mandatory injunction forcing the RCRA Defendants to cease their ongoing violations of RCRA regulations and to properly remediate the contamination site.

72.   Pursuant to 42 U.S.C. § 6972(e), the Court may award Stratford, as the substantially prevailing party, its costs of litigation, including reasonable attorney fees and expert witness fees.

**COUNT  II[3]**
**(Against the RCRA Defendants)**
**CONTRIBUTION TO MANAGEMENT OF HAZARDOUS WASTE**
**IN A MANNER THAT MAY PRESENT**
**IMMINENT AND SUBSTANTIAL ENDANGERMENT**
**42 U.S.C. § 6972(a)(1)(B)**

73.     Stratford incorporates fully all previous paragraphs.

74.     Pursuant to 42 U.S.C. § 6972(a)(1)(B) of RCRA, a private citizen may bring

a suit against "any person . . . who has contributed or who is contributing to the past or

present handling, storage, treatment, transportation, or disposal of any solid or hazardous

waste which may present an imminent and substantial endangerment to health or the

environment."

75.     By sub-leasing the Property to a dry cleaning business and/or owning or

operating a dry cleaning business on the Property that generated PCE waste in a manner

resulting in disposal of the PCE waste on the Property, retaining control over the Property

where the contamination was released at the time it was released, thereby contaminating

the Property with hazardous waste at concentrations far exceeding applicable regulatory

screening levels and failing to remediate, the RCRA Defendants  have all "contributed or

[are] contributing to the past or present handling, storage, treatment, transportation, or

disposal of any solid or hazardous waste which may present an imminent and substantial

endangerment to health or the environment."

76.     Pursuant to 42 U.S.C. § 6972(a)(1)(B), Stratford is entitled to a mandatory

injunction forcing the RCRA Defendants to refrain from contributing to an imminent and

---

[3] This Count has been dismissed by the Court and no answer to this Count is required.

substantial endangerment to human health or the environment and to properly remediate the contamination.

77.     Pursuant to 42 U.S.C. § 6972(e), the Court may award Stratford, as the substantially prevailing party, its costs of litigation, including reasonable attorney fees and expert witness fees.

## COUNT III
### (Against Foot Locker, Fog Cap and SummitBridge)
### DECLARATORY JUDGMENT REGARDING LEASE OBLIGATIONS

78.     Stratford incorporates fully all previous paragraphs.

79.     Under the terms of the Lease, Fog Cap and Foot Locker are jointly and severally obligated to maintain the Property "in the same repair and operating condition as at the beginning of the term of this Lease."

79.1.   As the alter ego of Fog Cap, SummitBridge shares Fog Cap's obligations under the Lease.

80.     The PCE contamination and other damage caused by Foot Locker, Fog Cap, SummitBridge and their subtenants have materially and adversely impacted the value of the Property.

81.     Fog Cap, SummitBridge, and Foot Locker have failed to maintain the Property "in the same repair and operating condition as at the beginning of the term of this Lease" due to, among other things, the contamination caused by the dry cleaning operations on the Property.

82.     Fog Cap, SummitBridge, and Foot Locker have failed to investigate properly the contamination caused by dry cleaner operations at the Property, despite Stratford's reasonable requests.

83.     Fog Cap, SummitBridge, and Foot Locker are jointly and severally obligated to pay the costs of investigating the full extent of the contamination and other damage, and restoring the Property to its uncontaminated, pre-Lease condition.

84.     Stratford has incurred costs at the Property due to Fog Cap, SummitBridge and Foot Locker's breaches of their obligations under the Lease.

85.     Under the terms of the Lease, Fog Cap, SummitBridge and Foot Locker must indemnify and hold harmless Stratford for all costs, including attorneys' fees and with interest, that Stratford incurs with regard to the Property.

## COUNT IV
## (<u>Against Foot Locker, Fog Cap, and SummitBridge</u>)
## BREACH OF CONTRACT

86.     Stratford incorporates fully all previous paragraphs.

87.     Fog Cap, SummitBridge and Foot Locker have breached paragraph 4.1 of the Lease by failing to maintain the Property "in the same repair and operating condition as at the beginning of the term of this Lease."

88.     Fog Cap, SummitBridge and Foot Locker have breached paragraph 1.2 of the Lease, as their failures to abide by the Lease terms caused Stratford to incur costs in relation to the Property.

89.     Fog Cap, SummitBridge and Foot Locker have breached paragraph 12.1 of the Lease by failing to indemnify, defend and hold harmless Stratford for Stratford's costs in relation to the Property.

## COUNT V
### (<u>Against all Defendants except Green</u>)
### TRESPASS

90.     Stratford incorporates fully all previous paragraphs.

91.     Defendants continuously or intermittently caused a trespass to Stratford's Property by failing to contain and allowing the dispersal of hazardous waste on the Property.  Defendants' release of hazardous waste is the direct and proximate cause of injuries and damages to Stratford's Property.

92.     Stratford is, therefore, entitled to damages in an amount in excess of $75,000, and to equitable relief in the form of removal of the pollution that occurred as a result of the Defendants' conduct alleged herein.

## COUNT VI
### (<u>Against all Defendants except Green</u>)
### PRIVATE NUISANCE

93.     Stratford incorporates fully all previous paragraphs.

94.     Defendants' actions placed, or caused to be placed, the PCE pollution onto the Property in excess of that allowed by law, subjecting Stratford to unreasonable inconvenience, interference, annoyance, and loss of use and value of its Property.  The nuisance has been continuing since the dry cleaning facility was in operation and continues today with the presence of hazardous waste in the soil and groundwater.

95.     Stratford is, therefore, entitled to damages in an amount in excess of $75,000, and to equitable relief in the form of removal of the pollution that occurred as a result of the Defendants' conduct alleged herein.

## COUNT VII
### <u>(Against all Defendants except Green)</u>
### PUBLIC NUISANCE

96.     Stratford incorporates fully all previous paragraphs.

97.     With their conduct in connection with the release of and failure to control PCE on the Property, Defendants have placed, or caused to be placed, PCE pollution on the Property, where it caused pollution of the soil and groundwater, constituting a public nuisance in that it affects, at the same time an entire community, in violation of Oklahoma law codified at 50 Okla. Stat. § 2 as well as 27A Okla. Stat. § 2-6-105(A).

98.     As a result of such nuisance, Stratford has suffered, and will continue to suffer, injuries to its Property.

99.     Unless Defendants are ordered to remove the pollution by this Court, the threat of continued damage to Stratford's Property and the health of persons occupying the Property will continue.

100.    Stratford has suffered special injury in the form of lost revenues due to its inability to lease the Property due to the contamination, and in the form of expenses it will incur in connection with ODEQ's order for Stratford to undertake investigation and remediation of the Property.

101.    Stratford is therefore entitled to damages in an amount in excess of $75,000, and to equitable relief in the form of removal of the pollution that was a result of the Defendants' conduct alleged herein.

## COUNT VIII
## (Against all Defendants except Green)
## NEGLIGENCE

102.    Stratford incorporates fully all previous paragraphs.

103.    Fog Cap and Foot Locker breached the duty of due care they owed to Stratford by leasing the Property to a dry cleaning company, failing to ensure compliance with law, and failing to conduct adequate environmental investigations into the dry cleaning company's operations.

104.    Fog Cap and Foot Locker further breached their duty of due care by allowing the dry-cleaning subtenants to operate in a manner that contaminated the Property and failing to remediate.

105.    The Kyser Defendants breached their duty of due care by allowing contaminants to seep into the Property and by allowing the dry-cleaning subtenants to operate in a manner that contaminated the Property and failing to remediate.

106.    Chunga breached his duty of due care by allowing contaminants to be released and seep into the Property.

107.    Fog Cutter, SBN and Summit breached their duty of due care by failing to properly manage the Lease, failing to ensure compliance with law, allowing contaminants to be released and seep into the Property, and failing to remediate.

108.    The breach of these duties by Defendants has caused damage to Stratford's

Property.

109.   Stratford is entitled to damages in an amount in excess of $75,000 as a result of Defendants' conduct alleged herein.

## COUNT IX
## (Against all Defendants except Green)
## CERCLA COST RECOVERY

110.   Stratford incorporates fully all previous paragraphs.

111.   The Property is a "facility" within the meaning of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601, et seq.

112.   PCE is a "hazardous substance" within the meaning of CERCLA.

113.   A "release" of hazardous substances (PCE) within the meaning of CERCLA has occurred at the Property.

114.   Stratford has incurred "costs of response" within the meaning of CERCLA in connection with the actual or threatened release of hazardous substances at or from the Property.

115.   Stratford is likely to incur additional "costs of response" in the future in connection with releases or threatened releases of hazardous substances at or from the Property.

116.   The costs of response incurred by Stratford in connection with the release of hazardous substances are necessary costs of response within the meaning of CERCLA sections 105(25) and 107(a)(4)(B), 42 U.S.C. §§ 9601(25) and 9607(a)(4)(B).

117.   The costs of response incurred by Stratford in connection with the release of

hazardous substances have been and are consistent with the National Contingency Plan., codified at 40 C.F.R. Part 300.

118.    Defendants Foot Locker, Fog Cap, Fog Cutter, SBN, Summit, SummitBridge, the Kyser Defendants and Chunga (the "CERCLA Defendants") are each persons within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

119.    Defendants Foot Locker, Fog Cap, and SummitBridge are each a "person who at the time of disposal of any hazardous substance owned [and] operated [a] facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2).

120.    Defendants Fog Cutter, Summit, SBN, SummitBridge, the Kyser Defendants and Chunga are each a "person who at the time of disposal of any hazardous substance . . . operated [a] facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2).

121.    The CERCLA Defendants are each persons who arranged for the disposal of hazardous substances by contract or otherwise at the Property within the meaning of CERCLA. 42 U.S.C. § 9607(a)(3).

122.    Under CERCLA § 107(a), the CERCLA Defendants are liable for an equitable share of the costs of responding to releases of hazardous substances at the Property.

123.    Under CERCLA § 107(a), Stratford is entitled to recover from the CERCLA Defendants an equitable share of the response costs it has incurred and will incur in connection with the release of hazardous substances at and from the Property.

## COUNT X

**(Against all Defendants except Green)**
**CERCLA CONTRIBUTION**

124.    Stratford incorporates fully all previous paragraphs.

125.    Under CERCLA § 113(f), the CERCLA Defendants are each liable for an equitable share of the costs of responding to releases of hazardous substances at and from the Property.

126.    Stratford has entered into a consent order with ODEQ under which it will pay more than its equitable share of the costs of responding to the releases of hazardous substances at and from the Property.

126.1  Under CERCLA § 113(f), Stratford is entitled to recover from the CERCLA Defendants an equitable share of the response costs Stratford has incurred or paid and will incur or pay in connection with the release of hazardous substances at and from the Property.

**COUNT XI**
**(Against all Defendants except Green)**
**CERCLA DECLARATORY RELIEF**

127.    Stratford incorporates fully all previous paragraphs.

128.    A declaration of rights pursuant to 28 U.S.C. § 2201 and CERCLA 113(g), 42 U.S.C. § 9613(g) would alleviate the uncertainty currently facing the parties with regard to responsibility for future response costs under CERCLA

129.    Under CERCLA § 113(g), Stratford is entitled to a declaration that the CERCLA Defendants are each liable for an equitable share of the response costs that Stratford will incur in the future in connection with the release or threatened release of

hazardous substances at or from the Property.

**COUNT XII**
**(<u>Against all Defendants except Green</u>)**
**FEES AND COST FOR NEGLIGENT OR WILLFUL**
**INJURY TO PROPERTY**

130.    Stratford incorporates fully all previous paragraphs.

131.    In each of the above Counts, Stratford seeks to recover damages from Defendants for Defendants' negligent or willful injury to property and other incidental costs related thereto.

132.    Pursuant to Okla. Stat. Tit. 12 § 940, Stratford is therefore entitled to recover from Defendants the reasonable attorney's fees and court costs incurred by Stratford in pursuing its claims, together with interest thereon.

**PRAYER FOR RELIEF**

WHEREFORE, Stratford respectfully demands and prays for judgment against Defendants as follows:

(i)    That declaratory judgment be entered in favor of Stratford and against Fog Cap, Foot Locker, the Kyser Defendants, Green and Chunga, jointly and severally, as to such Defendants' liability for the contamination under RCRA;

(ii)    That an Order be issued providing Stratford the requested RCRA injunctive relief and requiring Fog Cap, Foot Locker, the Kyser Defendants, Green and Chunga, jointly and severally, to cease their ongoing violations and abate the endangerment by remediating all property impacted by their release of

contamination at Stratford's Property pursuant to OAC 252:13-1 and ODEQ oversight;

(iii)    That judgment be entered in favor of Stratford, as the substantially prevailing party, and against Fog Cap, Foot Locker, the Kyser Defendants, and Chunga, jointly and severally, under RCRA for recovery of Stratford's attorney and expert witness fees and costs of litigation;

(iv)    That an Order be issued declaring that Fog Cap, SummitBridge, and Foot Locker have breached the Lease, and are jointly and severally required to remove all dry-cleaning equipment and related waste, and to remediate the Property and all other impacted property;

(v)    That judgment be entered in favor of Stratford and against Fog Cap, SummitBridge and Foot Locker, jointly and severally, for all costs Stratford has incurred due to Foot Locker's, Fog Cap's, and SummitBridge's breach of the Lease, including costs for investigating the Property in connection with the PCE contamination, together with interest, loss of rent and return of the Property to "the same repair and operating condition as at the beginning of the term of" the Lease, attorneys fees and interest;

(vi)    That judgment be entered against all Defendants, except Green, on Stratford's trespass claim and damages be awarded to Stratford in an amount determined at trial;

(vii)   That judgment be entered against all Defendants, except Green, on Stratford's private nuisance claim and damages be awarded to Stratford in an amount determined at trial;

(viii)  That judgment be entered against all Defendants, except Green, on Stratford's public nuisance claim and damages be awarded to Stratford in an amount determined at trial;

(ix)    That judgment be entered against all Defendants, except Green, on Stratford's negligence claims and damages be awarded in an amount determined at trial;

(x)     That judgment be entered in favor of Stratford and against all Defendants, except Green, under CERCLA requiring that each of these Defendants pay their equitable share of the response costs incurred or to be incurred by Stratford, together with interest thereon, in conjunction with the release or threatened release of hazardous substances at the Property;

(xi)    That judgment be entered in favor of Stratford and against all Defendants, except Green, under CERCLA declaring that Defendants are each liable for an equitable share of the response costs Stratford may incur in the future, together with interest thereon, in connection with the release or threatened release of hazardous substances at the Property;

(xii)   That judgment be entered in favor of Stratford and against all Defendants, except Green, jointly and severally, under 12 Okla. Stat. § 940 for all

attorney fees and court costs incurred by Stratford in connection with this action;

(xiii)   That judgment be entered in favor of Stratford and against all Defendants, except Green, jointly and severally, for all costs of this action pursuant to 12 Okla. Stat. §§ 928 and 930;

(xiv)   That judgment be entered in favor of Stratford and against all Defendants, except Green, jointly and severally, for pre- and post- judgment interest on all judgment amounts, costs and attorneys fees; and

(xv)   That the Court grant Stratford such other and further relief at law or in equity as may be justified by the evidence and the law and as the Court may deem just and proper.

**Jury Trial** demanded on all issues so triable.

Respectfully submitted,

/s/ Jim D. Dowell
Jim D. Dowell, OBA #19447
Jim D. Dowell, P.C.
2315 Downs Avenue, Suite 220
Woodward, Oklahoma 73801
(580) 254-0081 (telephone)
(580) 254-0037 (facsimile)
jdowell@dowelllaw.net
-and-
J. Chris Horton
J. CHRIS HORTON, PC
P.O. Box 576
El Reno, OK 73036
(405) 317-4423 (telephone)
jchrishorton@live.com
*Counsel for Stratford Holding, LLC.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 18th day of February, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the electronic records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

R. Tom Hillis
Kyle Alderson
Titus Hillis Reynolds Love Dickman & McCalmon
15 E. 5th Str. Suite 3700
Tulsa, OK 74103
thillis@titushillis.com
*Counsel for Elaine K. Hall Revocable Trust*

Bryan N. B. King
Stephen J. Moriarty
Fellers snider Blankenship Bailey & Tippens-OKC
100 N. Broadway Ave. Suite 1700
Oklahoma City, OK 73102
bking@fellerssnider.com
smoriarty@fellerssnider.com
*Counsel for Fog Cap Retail Investors, LLC*

Leif E. Swedlow
Rubenstein & Pitts, PLLC
1503 East 19th Street
Edmond, OK 73013
leswedlow@oklawpartners.com
*Counsel for William E. Chunga*

Douglas Rice
Larry Derryberry
Robert N. Naifeh, Jr.
Derryberry Quigley Solomon & Naifeh-OKC
4800 N. Lincoln Blvd.
Oklahoma City, OK 73105
drice@derryberrylaw.com
lderryberry@derryberrylaw.com
rnaifeh@derryberrylaw.com

Kenneth A. Reich
Kenneth Reich Law LLC
745 Boylston Str. 7th Floor
Boston, MA 02116
kreich@kennethreichlaw.com
*Counsel for Foot Locker Retail, Inc.*

D. Kenyon Williams
Seth Day
Hall Estill-Tulsa
320 S. Boston Ave Suite 200
Tulsa, OK 74103
kwilliams@hallestill.com
sday@hallestill.com
*Counsel for Summit Investment Management, LLC*

Daniel A. Platt
Donald A. MIller
Loeb & Loeb, LLP
10100 Santa Monica Blvd, Suite 2200
Los Angeles, California 90067

Telephone:  310-282-2110
Facsimile:   310-919-3503
dmiller@loeb.com
*Counsel for Fog Cutter Capital Group, Inc.*

I further certify that on the 18th day of February, 2019 I served the attached document by First Class U.S. Mail, postage pre-paid, on the following, who are not registered participants of the ECF System:

Kyser Koncepts Ltd.
Arthur B. Kyser, President
PO Box 890
Montgomery, TX 77356

Timothy W. Kyser
2221 Justin Rd. Suite 119
#139
Flower Mound, TX 75028

Arthur B. Kyser
3522 Crown Point Dr.
San Diego, CA 92109

Deborah Manneck
3522 Crown Point Dr.
San Diego, CA 92109

Jeffrey P. Green
1120 Patio Dr.
Cheyenne, WY 82009

s/ Jim D. Dowell
Jim D. Dowell